THE MUTUAL SAFETY INSURANCE COMPANY *vs.* ESDALE P. COHEN.—*June* 1846.

Where a vessel insured was, by one of the perils insured against, so far damaged, that under all the circumstances attending her situation consequent on said injury, it was necessary, *in the opinion of the jury*, for the interest of all concerned, that she should be sold, and that under such necessity, she was, in good faith, sold by order of a court of admiralty, decreeing salvage, the assured is entitled to recover for a total loss, although the jury may find, or the court be of opinion, that there was no valid abandonment by him.

If there be an urgent necessity for the sale of an insured vessel, damaged by the perils of the sea, the master, as agent, both of the insured and underwriter, has a right to sell the vessel, and such sale constitutes a total loss, for which the underwriters are responsible; and if the jury find such necessity, there is no obligation on the part of the assured to abandon.

Where a variety of prayers were submitted to the court by the plaintiff and defendant, and the instruction given by the judge to the jury, covered the whole ground of controversy, the judgment will not be reversed, though some of the prayers refused, were in themselves correct.

APPEAL from *Baltimore* county court.

This was an action of *assumpsit*, brought against the appellants, a foreign corporation, incorporated by the State of *New York*, on 31st December 1842. The company appeared, and pleaded *non assumpsit*.

At the trial of this cause, the plaintiff, to prove the issue on his part, offered in evidence the policy of insurance, executed by the defendant, for "*E. P. Cohen*, on account of whom it may concern. Loss payable to him, by which they caused to be insured, at and from the 13th August 1842, at noon, until the 13th August 1843, at noon; if then absent, liberty to renew for three months, at *pro rata* premium, each passage subject to its own average, upon the body, tackle, &c., of the good brig, called the *T. Street*. Beginning the adventure upon the said vessel, &c., at and from, as aforesaid, and so shall continue and endure, until, as aforesaid. And it shall and may be lawful for the said vessel, in her voyage, to proceed and sail to, touch and stay at, any ports or places, if thereunto obliged by stress of weather, or other unavoidable accident, without prejudice to this insurance. The said vessel, tackle, &c., hereby insured, are valued at the sum insured, $10.000, without any further account to be given by the assured to the assurers, or any of them, for the same, touching the adventures and perils, which the *Mutual Safety Insurance Company* is contented to bear, and take upon itself in this voyage; they are of the seas, men of war, &c.

And it is further agreed, that in case a total loss shall be claimed for, or on account of any damage or charge to the said vessel, the only basis of ascertaining her value, shall be her valuation in this policy."

It was admitted, that at the date of said policy, and thenceforth, and at the time of the loss claimed for in this case, the plaintiff was owner of the vessel mentioned, as insured by said policy. The plaintiff then read in evidence the following depositions :—

*Thomas Cromwell* deposes, that he was the master of the brig *T. Street*, on her voyage from *New Orleans* to *Kingston, Jamaica;* that he left the *Balize*, on the first day of October

1842; they had bad weather from the time the steamboat took them over the bar, and on the 3rd of October it came on so heavy, they had to heave to under a forespencer. About four o'clock, on the 4th of October, the spencer blew away, and they lay under bare poles, and the brig was on her beam ends, and they cut away her mainmast to keep her off before the wind, seeing that she would not right unless her mainmast was cut away. In cutting away her mainmast, it carried away the fore topmast and all the sails and rigging attached to them, and left them no sails at all, except, &c., which were in the cabin. After the gale was over, they got the before mentioned sails up, and steered before the wind, and on Monday week, the 12th of October aforesaid, they struck on *Florida reef*, and let go both anchors, and brought her up, head to the wind. They lay there all night, just clear of the bottom, and the next morning the sea broke all around her, and she began to thump heavy on her bottom, and deponent was afraid she would bilge, and slipped her chains and let her go ashore, and started his mate and two men to *Key West* for assistance, and at ten o'clock that night got assistance, and lightened the brig, by taking flour out of her, and they found three feet of water in her hold. Deponent finally gave her up to the wreckers, and they got her into *Key West*, by keeping both pumps going all the time to keep her free. At *Key West* he called a survey on her, and the surveyors advised her to be sold, and deponent applied to the court for a sale. It was then costing twenty dollars a day to keep her pumped out, to prevent her sinking along side the wharf. The judge of the court ordered her to be sold, and awarded one-half of the proceeds of sale to the salvors. The brig was sold under the order of the court, and the vessel and all her materials sold for about eleven hundred dollars. He brought home about eighteen hundred dollars, on account of the vessel and cargo; how much on account of the vessel, and how much on account of the cargo, he does not know now; he gave the papers to *Mr. Cohen*, the plaintiff.

*Cross Examined.*—Deponent states that he could do nothing with her, that he was afraid of the lives of the crew, and they slipped the chains to let her go ashore, and sent for the

wreckers. It was twenty miles from the reef to *Key West*. Deponent took the cargo of flour, (not quite all—as much as he could get,) and either the next day or the day after, the wreckers brought her to *Key West;* there were from twenty to thirty wreckers on board of her. Deponent went with the cargo of flour to *Key West*, and the mate and crew went with the vessel to *Key West*. The brig drew about seven feet, without cargo, and ten when loaded with flour. He had two mates and four men before the mast, the cook and himself. The brig was sold by order of the court, and was bought by a gentleman of *Key West*, by the name of *S. Healy*. When deponent left, *Healy* was repairing her, and had put masts in her which he took from another vessel. Deponent knows nothing about her since. Deponent was about twenty days in *Key West*.

The survey set forth, that the surveyors report : "Repaired on board said vessel, and after a careful and impartial survey of her hull, &c., find that she was dismasted in a hurricane on the 4th inst., in which she lost all her spars, except fore-mast, fore-yard and bow-sprit, with the entire rigging and sail, and the hull very much strained throughout, after which she run ashore on the reef, where she lost both anchors and chains, and now leaks so badly as to keep both pumps constantly going. We therefore recommend the master of said vessel, to incur no expense on said vessel, but to sell her immediately for what she will fetch, as her condition is so bad as not to warrant an estimate of repairs."

One of the surveyors, sworn by the plaintiff, on cross-examination deposed, that in the examination, the leak appeared to be in her bottom, occasioned by great straining the brig had had that the leak was not stopped then; that he saw the brig sometime afterwards, hove keel-out at *Green's* wharf, and carpenters endeavoring to heave the after-part of the keel into its place; that he presumes they stopped it then; does not know whether they did or not; that the leak was not ordered to be stopped by the surveyors, nor examination of her bottom had, in consequence of the brig being without spars and rigging sufficient to heave her down, and the expenses of fitting temporary ones

(it not being possible to procure proper spars for the vessel here,) would have been so great, that it was judged for the interest of all concerned, better for the master to abandon her, and sell her; and the surveyors did not believe, that the hull of the vessel was worth the expenses of the outfit it would have required, to render her fit to go to sea, it having been so much damaged and injured in the recent hurricane, and the severe thumping she had had upon the reef.

Another of the plaintiff's witnesses also stated on cross-examination, that he was present at the sale of the brig; thinks there were twenty or thirty persons present; that there were six or seven bidders; *Healy* was purchaser, as he understood from *Healy* himself.

One of the defendant's witnesses deposed, that the vessel could not have been made seaworthy, for the prosecution of her voyage, for four times the amount that it cost *Healy*, as he did not put sufficient repairs upon her, to render her seaworthy.

Another witness for the defendant, deposed, that after she was purchased by *Healy*, he saw the brig hove out; that she appeared much strained; supposes that was the cause of her leaking; afterwards, made a voyage from *Key West* to *New Orleans* in the brig; that she continued to leak badly all the voyage. That the brig was sold, and bought by *Healy*, for himself. That the repairs of the brig here, *Key West*, were merely temporary, everything put upon her was temporary; these repairs cost between two and three thousand dollars, including the first purchase; that she was scarcely seaworthy when she left for *New Orleans*.

There was other proof of a similar character, that she could not have been repaired at a less expense; that she was sold in *New Orleans;* that she took in a cargo for *Havana;* that she then leaked so badly, that an extra number of hands had to be shipped to keep her sufficiently free, to enable her to proceed on her voyage to *Havana;* that when she returned to *New Orleans*, she was taken in the dry dock, and thoroughly repaired and coppered; that those last repairs cost about $4000,

as he was informed by the captain of the brig, who had become a part owner.

The plaintiff then read in evidence the following letters:—

Baltimore, October 28th, 1842.

CHAS. F. SINGLETON, ESQ.,
        Agent of the Mutual Safety Ins. Co. of New York.

SIR:—The only information I have relative to the brig *T. Street*, insured with you, is what is contained in a letter published in the newspapers, dated *Key West*, 14th October 1842; from which I infer, that the damage done the vessel, the expenses of getting her off, the salvage to be paid the wreckers, the expenses of repairs, and other expenses at *Key West*, will amount to what may be deemed a total loss of said vessel. In consequence, I hereby abandon to you said vessel, and claim from you a total loss. I am, respectfully, sir,

Your obd't serv't.

Signed,                         E. P. COHEN.

November 28th, 1842.

E. P. COHEN, ESQ.

DEAR SIR:—I have just received instructions from the *Mutual Safety Insurance Company of New York*, to notify you, that they disclaim all interest in the brig *T. Street*, and deny their liability for any but a partial loss on said vessel, under their policy. This partial loss, when properly proved and adjusted, will be promptly settled. The directors, believing that your title to the vessel has not been divested, and not intending to acquiesce in any but a claim for partial loss, as above stated, have deemed it right to give you this notice, that you may avail of the earliest occasion to reclaim the vessel.

Yours, &c.            C. F. S.

The plaintiff then read in evidence, a transcript of admiralty proceedings at *Key West*, upon a libel filed in the district court of the *U. S.*, praying for an allowance of salvage in relation to the said brig.

The district judge decreed, that the marshal advertise, and proceed to sell on the 19th inst., the said brig, she being found unworthy of repairs, and that he also sell so much of the cargo as may be necessary, with the proper proportion of the pro-

ceeds of the sale of the brig to pay the costs and expenses of this suit, the wharfage, storage, and labor in landing said cargo. That the residue of said cargo, the marshal and clerk divide and set off to the libellants, the one moiety thereof in full compensation for their services in saving the same, and that the clerk also pay the one moiety of the proceeds of the sale of the brig, to the libellants, after first deducting its proper proportion of the costs and expenses of saving said brig."

Under this decree, the sales of the brig amounted to $1109.15. Her cargo, in part, $623. Residue, five hundred and seven barrels flour, divided in kind, &c.

The defendant then proved, under a commission to *New Orleans,* that the witness has knowledge of the brig *T. Street,* as she lay in the port of *New Orleans,* on the 5th December 1842, having been on board of her on that day; that she was then in good condition, and deponent thinks sea-worthy. The condition of her hull was good and sea-worthy. Deponent saw the brig in September or August, 1842. The difference in value, on the 5th December 1842, and at the former period, when deponent saw her, deponent thinks was about $1500; that is to say, she was worth less by $1500 on the 5th December 1842, than she was in September or August previous, when deponent saw her. He does not know the name of the owner of the brig, on the 5th December 1842. Thinks her captain's name, in whose charge she was, was *Healy.* The cost of repairs necessary to place her in the condition she was, previously to her disaster, must have been, deponent thinks, about $1500. The repairs which she seemed to have undergone, to enable her to prosecute her voyage from *Key West* to *New Orleans,* to her hull, merely heaving out and caulking, and putting on part of a false keel. Her spars, rigging and sails, had all been changed, part new and part old, except the foremast, bow-sprit, fore-gaft, and fore-rigging. The deponent estimated the value of the brig, as she arrived from *Key West,* at $3500. Her value, he thinks, at *New Orleans,* after all necessary repairs should have been put upon her, would have been $5000; that is to say, if she had been put into as good order or condition, as she was in when deponent saw her, in

September or August 1842.   If coppering had been put upon her, she would have increased in value to $6000.

The defendant also proved by another witness, that he saw and examined the *T. Street*, for the first time, on the 9th January 1844; that he estimated the value of the said *T. Street*, on the said 9th January, if all necessary repairs were put upon her, at $5500; as she then was, he regarded her as worth $4000.   If copper had been put upon her, the value would be varied, in his estimation, $1000.   That he critically examined the said *T. Street*, on the 9th January 1844; that he found her hull in an excellent condition, and with no appearance of having ever suffered any damage; there had been no strain, either inside or outside, upon it; and her ways and fastenings, all appeared as fair as when first put in, and no signs of strains or leak in any part of them appeared.   Her bottom, when she was hove out to be coppered, was in good order, and did not show any signs of repairs having been lately made, except putting on it a small piece of the false-keel.   Her spars were all new, excepting the foremast, bow-sprit, and fore-gaff.   Her rigging was all new, except the lower rigging on the foremast.   Her sails were all composed of second-hand sails, that had been used in other vessels, and did not fit the spars to which they were attached.

Other evidence was also offered, of the condition of the brig, and cost of repairs, after the injury at *K. W.*, and, also, at *New Orleans*.

The defendant then prayed the court to instruct the jury :—

That the letter of the plaintiff to the defendant, given in evidence, and purporting to abandon to the defendant the vessel insured, does not operate as an abandonment; and that the plaintiff is entitled to recover only for a partial loss.

That the plaintiff is not entitled to recover for a total loss, unless they shall find, that the vessel by the disasters given in evidence, sustained damage, (including the amount of salvage adjudged and received, to an amount exceeding $5000; and that in estimating said damage, the jury are to take into consideration what was expended for the vessel's repairs at *Key West* after the sale, and what was afterwards expended on her to repair said damages, at *New Orleans*.

That in determining the necessity to sell, they are to have reference to the circumstances occurring subsequently to the sale of the vessel, in respect of the damage suffered by her, and the extent and cost of repairs actually required, and the actual condition of the vessel at *Key West*, before said sale.

That if they shall find that the master, after the arrival of the vessel at *Key West*, might have communicated by letter with the plaintiff, and through him, with the insurers, and obtained their directions as to the course to be pursued by him with the vessel, without such a delay as would have rendered the destruction, meanwhile, of the vessel probable; or, as would have made a sale of her necessary, to prevent total loss from her actually perishing, or being rendered utterly worthless, then the plaintiff is not entitled to recover, except for a partial loss.

That the necessity that suffices to warrant a sale by the master, must be one which leaves no alternative to a sale, and puts the party in a state of positive compulsion to act.

That according to the true construction of the policy, as given in evidence, the necessity to justify a sale does not arise, unless the damage, (including the amount of salvage adjudged and received,) shall be found by the jury to have exceeded one-half of the value of the said vessel, as stated in the policy; that is to say, that if the jury shall believe from the evidence, that the repairs and expenses of the vessel at *K. W.*, and the necessary repairs at *Key West* to enable her to proceed to *New Orleans*, and the repairs and expenses for repairing her damage thoroughly, added to the salvage aforesaid, did not exceed the said one-half, the plaintiff is not entitled to recover for more than a partial loss.

That in determining upon the point of necessity to sell, the jury are to attach no weight to the recommendation of a sale made by the two surveys, inasmuch as the said surveyors are not on oath,—and show, that there was no thorough examination of the vessel by the surveyors, nor any estimate of requisite repairs, temporary or thorough; and that to ascertain the actual damage suffered by the vessel, and the necessity of the sale, the jury are not only to take into view the circumstances,

as appearing at *Key West*, in reference to the vessel, but also the fact of the subsequent repairs, and the amount thereof, and the restoration of the vessel, so far as the same are shown in testimony.

The plaintiff prayed the court to instruct the jury, as follows :—

If the jury shall find from the evidence, that the vessel insured was, by one of the perils insured against, so far damaged, that under all the circumstances attending her situation at *Key West*, consequent on said injury, it was necessary, in the opinion of the jury, for the interest of all concerned, that said vessel should be sold; and that under such necessity she was in good faith sold, by order of the court, at the time mentioned in the evidence, then the plaintiff is entitled to recover for a total loss on the policy; although the jury may find, or the court be of opinion, that there was no valid abandonment.

The court, (LE GRAND, A. J.,) refused to grant any of the prayers of the defendant, and granted the prayer of the plaintiff, and directed the jury as follows :—

The principles which necessarily arise in this case, are of the first importance to the commercial community; and have been, by the learned counsel, discussed with an ability, which has aided the court much in the formation of the opinions, which it is called upon to announce.

Whatever criticism the case of *Bosley vs. The Chesapeake Insurance Company*, 3 *Gill & Johns.*, 465, may have been subjected to elsewhere, so far as this court is concerned, such strictures can have no influence; for its duty is, to announce the law as it has been decided by the supreme court of the State, leaving to that tribunal the exercise of its peculiar function, of reviewing its own decisions, as well as those of the inferior courts. In that case the Court of appeals said : "Upon principles of reason, justice, and policy, we deem this rule undeniable, that the information which is sufficient to authorise the assured to give notice to the underwriters, that he abandons, must be of such facts and circumstances as would sustain the abandonment, if existing in point of fact, at the time the notice is given." Of what character those facts must be, the court

refer to several authorities to show. Among these, is *Philips on Insurance*. This commentator, at page 448 of his treatise, says: "The underwriters ought to know the grounds of the abandonment, that they may determine whether to accept. Accordingly, the assured must, at the time of making the abandonment, make known to the insurers the reasons for which he abandons. He cannot avail himself of any other ground, than that alleged by him at the time of abandoning; and if there be any other facts, (either known, or not known to him at the time,) on which an abandonment would be necessary, in order to entitle him to recover for a total loss, he must abandon anew, before he can recover for such a loss, on account of those facts." So in *King vs. Delaware Insurance Co.*, 2 *Wash. C. C. Rep.*, 309, where it is said: "The underwriter should have an opportunity of judging, whether he is bound to accept or not. If bound, that he may do so at once, and take proper means for the preservation of the property." The purport of these authorities, in the opinion of the Court of Appeals, is, obviously, that an abandonment, to be sufficient, must disclose to the underwriter such facts and circumstances, as would furnish him an opportunity to decide, whether or not he will accept.

In the case, *Bosley vs. Ches. In. Co.*, in which these authorities are referred to, and adopted, the insured, by letter, communicated the intelligence to the company, that he had observed by a *Boston* newspaper of the 29th January, that the ship *Gen. Smith*, insured in their office, was driven ashore in a heavy gale of wind the 6th December; and by a *Charleston* paper, of the 26th January, that on the 13th, she was got off. that in so dangerous a situation as *Helvoct Roads*, it was to be feared that a total loss had ensued, and he, therefore, abandoned her. The court, when considering this letter, inquired, whether "the facts disclosed in the notice shew a total loss, either actual or technical;" for said they, "unless they do, the abandonment is wholly defective." "If," (say the court, in the prosecution of this inquiry,) "mere stranding be not a total loss, there is no total loss disclosed by the notice. The only facts upon which such conclusion could rest, are, that in a gale

of wind the ship was driven on shore, and had remained there
seven days.   But, whether she remained there from choice, to
make some inconsiderable repair, as for example, to re-ship
her rudder, or from necessity; whether she was thrown one
foot, or one mile from the channel of the river; whether she
laid high and dry, or in ten feet water; whether she had sus-
tained any damage by the accident; whether any effort had
been made to get her afloat; or whether the accomplishment of
that object was impracticable, or could be accomplished by the
expenditure of ten dollars, or ten thousand dollars; were mat-
ters on which the insurers were left to speculate in utter dark-
ness."   The abandonment was held insufficient.   Wherein
the intelligence communicated by the plaintiff to the defen-
dants, was more full than that communicated by *Bosley,* I am
unable to discover.   It informs the company of the following
facts :—That, from a letter published in the newspapers, dated
*Key West,* 14th October 1842, he inferred, the damage done
the vessel, the expense of getting her off, the salvage to be paid
the wreckers, the expenses of repairs, and other expenses, at
*Key West,* would amount to what might be deemed a total
loss of said vessel.   What information the letter of 14th Octo-
ber contained, is unknown; it not having been offered in evi-
dence.   If this letter of the 28th October 1842, be subjected to
the same kind of examination as was that of *Bosley's,* there
certainly ought to be no difficulty in determining, that it is
equally insufficient; and if this case was, in my estimation, simi-
lar in all its circumstances to that case, there would be an end,
in my judgment, to the question of total loss.   But according
to my apprehension, there is a marked distinction between
them.

   The proposition of the plaintiff, contained in his first prayer,
is intended to raise the question, how far any act of the master
of the vessel, and the circumstances attending that act, can
operate to make a total loss.   In other words, if the jury shall
believe the master acted in good faith for all parties concerned;
and shall further believe from the evidence, that at the time
of the sale, such sale was a matter of necessity, whether such
act of the master and such sale, make the loss a total loss?

The same prayer of the plaintiff presents also the additional question, whether, upon the jury finding the facts just mentioned, in such a case, the plaintiff was under any obligation to abandon at all to entitle him to recover for a total loss?

In the case of the brig *Sarah Ann, Woodbury and others, claimants, 2nd Summer's Reports,* 215, *Judge Story* said: "It has been suggested, that as the stranding was on a home shore, at no great distance from the residence of the agent of the owners, the master was not authorised to sell without consulting the agent or the owners. I agree at once to the position, if there is no urgent necessity for sale. But if such an urgent necessity does exist, as renders delay highly perilous, or ruinous to the interests of all concerned, the duty of the master is the same, whether the vessel be stranded on the home shore, or on foreign shore; whether the owner's residence be near, or be at a distance. I am aware of the doctrine maintained by my brother, the late *Mr. Justice Washington* in *Scull vs. Briddle,* 2 *Wash. Cir. C. R.* 150, and unless it is to be received with the qualification above stated, I cannot assent to it. The fact that the brig was actually gotten off by the purchaser after sale, is certainly a strong circumstance against the necessity of the sale. But it is by no means decisive; for we are not, in cases of this sort, to judge by the event; for a vessel may be apparently in a desperate situation, and yet by some luck, accident, or unexpected occurrence or fortunate circumstances, she may be delivered from her peril. We must look to the state of things, as it was at the time of the sale, and weigh all the circumstances: the position and exposure of the brig; the season of the year; the dangers from storms; the expense of any attempt to get her off; the probable chances of success; and the necessity of immediate action on the part of the master, one way or the other."

In the case of *Catlett and Keith vs. The Pacific Ins. Co. of New York,* 1 *Wendel,* 561, it was held, that a report by the surveyors of a port, into which a vessel put in, in distress, that the repairs of a vessel insured cost $20,000, when the vessel itself was valued at $10,000; and proof, that upon such report, and at the request of the master, the vessel was sold by order

of a court of vice-admiralty, is sufficient evidence of a technical total loss, especially where the underwriters put their refusal to pay upon other grounds.

In the case of *Cambridge vs. Anderton*, 9 *Eng. Com. Law Rep.*, 224, the facts were these: *assumpsit* was brought on a policy of insurance on the ship *Commerce*, from Quebec to *Bristol*. It appears that the ship, with a cargo on board, sailed from Quebec, and about two hundred miles below Quebec, got upon rocks, in the river *St. Lawrence*, in foggy and tempestuous weather. She was much injured, and surveyed by experienced persons, who gave it as their opinion, that the expenses of getting her off the place where she was lying, if it could be accomplished, and repairing her, would far exceed the value of her when repaired; under these circumstances, the captain and agent for the plaintiff, sold the ship, with her certificate of registry. The purchaser did succeed in getting her off the rocks, took her back to Quebec, and repaired her; she afterwards sailed on a voyage to *England*. The Lord Chief Justice told the jury, that if, under the circumstances in evidence, they thought that the ship was not repairable at all, or that when repaired, she would not be worth the expense of doing the repairs, the plaintiff was entitled to recover for a total loss; but if otherwise, they could claim for an average loss only. The jury found a verdict for a total loss, and a new trial was moved for. *Abbott, Chief Judge*, said : "whether the ship was repairable or not, was left to the jury, and I think they disposed of it correctly. If the subject matter of insurance remained a ship, it was not a total loss, but if it were reduced to a mere congeries of planks, the vessel was a mere wreck; the name which you may think fit to apply to it, cannot alter the reason of the thing." And *Bayley, Judge*, said : "I take the legal principle to be this, if by means of any of the perils insured against, the ship ceases to retain that character, and becomes a wreck, that is, a total loss, the master may sell, and the assured may recover for a total loss, without giving any notice of abandoment." And *Holroyd, Judge*, said : "when the damage sustained makes a total loss, it is unnecessary to give notice of abandonment.

The Supreme Court of the *United States*, in the case of the *Patapsco Insurance Co. vs. Southgate, et al.*, 5 *Peters*, 621, observes, that "as a general proposition, there can be no doubt, that the injury may be so great, and the necessity so urgent, as to justify a sale. There must be this implied authority in the master, from the nature of the case. He, from necessity, becomes the agent of both parties; and is bound, in good faith, to act for the benefit of all concerned, and the underwriter must answer for the consequences, because it is within his contract of indemnity." The court, however, do not decide, whether in such a case, to enable the insured to recover for a total loss, it is necessary that he should abandon; but at page 623 of the same report, they intimate strongly, that such is the law. Their language is: "It may not be amiss to observe, that there is very respectable authority, and that too, founded upon pretty substantial reasons, for saying, that no abandonment is necessary where the property has been legally transferred by a necessary and justifiable sale." In sustentation of this intimation, they refer to 2 *Pickering*, 249. In this case, *Gordon vs. Massachusetts Fire and Marine Insurance Company*, the whole subject is fully reviewed and discussed with eminent ability and clearness. It is not deemed necessary to refer to many cases cited in that opinion. The conclusion at which the court arrived, seems to me that which is only deducible from all of them. *Parker, Chief Judge*, in delivering the opinion of the court, in this case, said: "I think, when a vessel has been so far injured by a peril of the sea, as to make a survey necessary, and the master, with perfect good faith, calls such survey, and the persons appointed to take it, are competent in point of skill, and wholly disinterested, and they, after a full and sufficient examination of the vessel, find her essentially injured, and come to a fair conclusion, that from the high price of materials and labor, or the difficulty of procuring them, the expense of repairing will be more than the worth of the vessel after she is repaired, and therefore they advise, for the interest of all concerned, that the vessel be sold; in such a state of things as this, it seems to me that a moral necessity is imposed upon the captain, to act according to their advice. It must be considered,

60    v.3

that thus situated, he becomes, by law, an agent for the insurers as well as the insured; and is equally bound to look to the interest of both. Shall he, in defiance of such an opinion, proceed to repair the vessel, with the certainty of adding to the misfortune which has already befallen either the owner or the insurer? Or shall he leave the vessel, without selling or repairing, until he shall return home and communicate her situation to those concerned, that they may act for themselves in relation to her? I think neither of these things would be expected of him, and that such a course would be exceedingly prejudicial to commerce? The only alternative left for him, is to pursue the advice of that body of men, who, by the usage of trade, have been immemorially resorted to on such occasions. If they acted fairly, and the captain acted fairly, his acts in conformity with their opinions, will be justified; unless it shall be made to appear, by those who contest the loss, that the facts on which they founded their opinions, were untrue, or the inferences which they drew from those facts, were incorrect. And the burden of proof should be upon those who would impeach the proceedings. If they should be successfully impeached, I think the sale of a vessel, founded upon them, cannot be set up as a ground for a claim of total loss, against the underwriters." "In such a case," says the court, "if the jury were satisfied from all the evidence, giving due weight to the opinions of the surveyors, that the sale was necessary, then the sale constituted a total loss; and we think, that an offer to abandon, would not have been necessary; but the fact, itself, of a sale, would constitute a total loss." All of these cases decide, clearly, the point, that if there be an urgent necessity for it, the master, as agent of both the insured and underwriters, has a right to sell the vessel, and that such sale constitutes a total loss, for which the underwriters are responsible; and the one in 9 *Eng. C. L. Rep.*, 224, and the one in 2 *Pickering*, 249, also establish the principle, that in such a case it is not incumbent upon the insured to abandon at all.

The same doctrine is maintained in a great number of other cases, both *English* and *American*, the most prominent of which are referred to in 2 *Pickering*, 249, and in case of *Roux*

*vs. Salvador*, 32 *Eng. Com. Law*, 110. The principle seems to be this: that where the insured has property which he can transfer, he is bound to abandon; but when he has been divested of his title by a sale, which is warranted by the rules of law, there is nothing to abandon, and he is not compelled to perform a useless and unmeaning ceremony. From what has been said, it is obvious, that, in my opinion, if the captain himself had, at private sale, sold the brig *T. Street,* and the jury should believe, from all the circumstances, that such sale was made under an urgent and absolute necessity, there was no obligation on the part of the plaintiff to make an abandonment. This being the case, it is deemed a matter of no importance, whether the sale was made by the captain, or in pursuance of the decree of a court of competent jurisdiction, for on the concurrence of the circumstances which I have stated, the loss is a total loss. This capacity of the captain to sell, is one, however, which only attaches in cases of extreme, urgent, and absolute necessity. His fears are not to be the standard by which the existence of any such necessity is to be determined; nor are the improper interferences of those with whom he consults, to determine the fact. It is for the jury to ascertain, from all the circumstances attending the case at the time of sale, whether there existed such a necessity for the sale, for the benefit of all parties concerned, as ought to have induced the captain to have effected it.

In the case of *Bryant et al., vs. Commonwealth Ins. Co.,* 13 *Pick.*, 543, this question of necessity is fully examined. The court there say: "He, (the captain,) might be justified, if the necessity were so urgent as to require immediate action; as, if the goods would probably perish or be destroyed, before the directions of the owners could be obtained. But, if the goods were not perishable, or damaged, and might be preserved in reasonable safety, until the owners could be consulted, he should preserve and guard them; and in such case, he would have no more authority to break up the voyage, and sell the cargo, than the mate or a stranger would have. And, notwithstanding, he conducted himself honestly, yet, if the other elements, which make up this legal necessity, were wanting, the owners and underwriters would not be bound."

In the case of *Hall vs. Franklin Ins. Co.*, 9 *Pick.*, 478, it was held, that the necessity which will justify the master of a ship in selling her, is one in which he has no opportunity to consult the owners or insurers, which leaves no alternative. "There must be," say the court, "something more than expediency in the case; the sale should be indispensably requisite. The reason for it should be cogent. We mean a necessity which leaves no alternative; which prescribes the law for itself, and puts the party in a positive state of compulsion to act." Whether the sale in this case, was made to satisfy the claim of the salvors, and at their instance, or at the instance of the captain, I do not deem it important to decide; for whether the one or the other, I take it, its influence here would be the same. Whilst the third proposition of the defendant, that the decree should have no weight with the jury, must be rejected, nevertheless, that contained in the second prayer of the plaintiff, cannot receive my assent. To sustain the third proposition of the defendant's counsel, the case of *Parrling vs. Ex'rs of Bird*, 13 *John.*, 192; and the case of *Baldwin and Worthington vs. Hale*, 17 *John.*, 272, have been referred to. According to my apprehension, neither of the cases have any thing to do with the question. In the first mentioned case, *Pratt, Judge*, said: "It is well settled, that a judgment in another State, (one of the *U. S.*,) is to be considered here as a foreign judgment in every respect, except in the mode of proving it, which is regulated by a statute of the *United States*. It is only *prima facie* evidence of a debt, and may be impeached, when attempted to be enforced, as unjust, or unfair, or irregular." In the other, 17 *John.*, 271, it was held, that a replication of *nul tiel* record to a plea of judgment, recovered for the same cause of action in the circuit court of the *U. S.*, must conclude to the country, and not with a verification. This decision was founded upon the idea, that as the State court of *New York* had not the power to compel the transmission of the record from the circuit court of the *United States*, the replication ought to conclude to the country, for that was the only way in which its verity could be tested. Both of these decisions proceed upon the idea, that the courts of the several States, to those of the other States,

must be viewed as foreign courts. It is not necessary for me to controvert this opinion, although it might be done on the authority of a number of cases. A different doctrine was held in 9 *Mars.*, 464, 465. 7 *Cranch*, 485. 1 *Peter's Rep.*, 78. *Hardin's Rep.*, 413. And in *Wheaton*. But, if we were to admit the truth of the doctrine in *Johnson's Reports*, still they can have no bearing upon this case; for in those cases, it was sought to enforce judgments obtained in other States, and it is only in such cases, the merits of a foreign judgment can be examined, 3 *John. Rep.*, 169. Here, there is no such attempt made. The matter to be enquired of, is simply, whether there was a sale, either at the instance of the salvors, or at the instance of the captain; and if so, was it made under such circumstances as were warranted by the law, and determine the responsibility of the defendants. Assimilating, then, this decree, of one of the federal courts, to one of a State court, and give to the cases in *Johnson* their full force, how does the matter stand? Simply this, the decree may be impeached, if the sale ordered was not justifiable. I mean, if it was not made on such grounds as would fix the liability of the underwriters. For, although the sale and delivery of the property, in pursuance of such decree, might vest in the purchaser a good title, yet, this circumstance alone, would not ascertain the liability of the defendants for a total loss. Their liability does not depend upon the decree, or upon the sale *per se*, but upon the justifiableness of the sale; upon the necessity there was for it. Entertaining these views, all the propositions of the defendant must be overruled, and, also, the second prayer of the plaintiff. Believing there is testimony to go to the jury, from which they may infer the existence of a necessity for the sale, the first proposition of the plaintiff is granted.

To the refusal of the defendant's prayers, and granting of the plaintiff's, and to the direction and opinion aforesaid, of the court, the defendant excepted, and prosecuted this appeal.

The cause was argued before ARCHER, C. J., DORSEY, CHAMBERS, SPENCE, MAGRUDER and MARTIN, J.

By DAVID STEWART and MAYER for the appellants, and
By GLENN and MCMAHON for the appellees.

MAGRUDER, J., delivered the opinion of this court.

This suit was brought in *Baltimore* county court, by the
defendant in this court, on a policy of insurance; the vessel
insured being, by some of the disasters insured against, much
damaged.

The policy on which the suit was instituted, bears date 13th
August 1842, and was effected on the brig, *T. Street,* valued
in the policy at $10,000. On her voyage, she encountered
a gale, which did her very much damage. While making her
way to a port of safety, she was grounded on a reef about
twenty miles from *Key West*, at which place she arrived, 14th
August 1842, laden with about twelve hundred barrels of flour.
Surveyors, appointed for the purpose, reported, that the condi-
tion of the vessel did not justify her being repaired, and they
recommended that a sale of her should immediately be made;
or, that the expense of keeping her afloat should be avoided,
by allowing her to sink, until a sale should be made.

There is much other proof with respect to the damage done
to the vessel, the hopelessness of her condition, and the una-
voidable expense of any delay in making sale of her.

Immediately after her arrival at *Key West*, the salvors filed
their libel, in which they claimed salvage for the vessel and
cargo. The court decreed a sale, allowing to the salvors one
half of the amount of sales, after deducting all expenses. A
few days thereafter, the brig was sold for $1010.

On the 24th October, the plaintiff in the court below,
addressed a letter to the defendant, giving "the only informa-
tion" he had, relative to the brig, *T. Street,* and claiming a total
loss. An answer to that letter, bearing date 28th of Novem-
ber, "disclaimed all interest in the brig, *T. Street,* and de-
nied their liability for any but a partial loss for the said vessel,
under their policy."

The claim, then, of the plaintiff in the court below, was for
a total loss; while his adversary insisted, that a recovery could
only be had for a partial loss. The verdict was for the plain-

tiff, and the case comes here upon several exceptions, taken by the defendant there.

In opposition to this claim, it was insisted, in the first place, that there is no proof in the record of a valid abandonment of this vessel. Of this opinion was the court below, and indeed, the plaintiff did not insist upon it, or seem to have supposed, that the letter written by him to the underwriter, would have entitled him to claim, as for a total loss; and accordingly he maintained, that in a case like this, the underwriter is under no obligation to abandon at all, in order to recover for a total loss.

The ground on which the claim was rested, was, that a sale of the vessel was necessary, and that it was for the interest of all concerned, that the vessel should be sold; and under such necessity she was, in good faith, sold at the time mentioned in the evidence. Of all this the jury were to judge, and by their verdict have established, the necessity for the sale; that it was for the interest of all concerned; and under such necessity, she was, in good faith sold, at the time and in the manner stated. All of this is conclusively established by the verdict of the jury, unless, indeed, the jury was misled by some erroneous instruction which they received from the court, or in consequence of a refusal by the court to give an instruction which was asked, and ought to have been granted. If the court was correct in the opinions which it expressed, and especially in the opinion, that there was no valid abandonment, it seems to be quite unnecessary to enquire, what proof would have been necessary in order to make out the case, if the plaintiff below, to make out his case, had been obliged to prove a valid abandonment, or an acceptance of the abandonment.

It is insisted, that the necessity which is to justify the sale of the ship by the master, must be one which leaves him no opportunity of consulting the owner, or underwriter, and that the master can only act for them, when they have no opportunity of acting for themselves. We do not discover, that the learned judge who instructed the jury, thought otherwise. In his instruction he says: "If there be an urgent necessity for it, the master as agent, both of the insured and underwriter, has a

right to sell the vessel; and such sale constitutes a total loss, for which the underwriters are responsible.—If the jury should believe, from all the circumstances, that such sale was made under an urgent and absolute necessity, there was no obligation on the part of the plaintiff to make the abandonment." Again, using the language of *Justice Story*, (2 *Sumner*, 215,) when answering a remark, that "as the stranding was on a home shore, at no great distance from the residence of the agents of the owners, the master was not authorised to sell, without consulting the agent of the owners," he said: "I agree at once to the position—if there be no urgent necessity for a sale. But if such urgent necessity does exist, as renders delay highly perilous, or ruinous to the interests of all concerned, the duty of the master is the same, whether the vessel be stranded on the home shore, or on foreign shore; whether the owner's residence be near, or at a distance." And after this, adopting also the language of another, he states: "The necessity which will justify the master of a ship in selling her, is one in which he has no opportunity of consulting the owners, or insurers—which leaves no alternative. The sale should be indispensably requisite." Surely in these passages, to be found in the opinion of the court below, (and others might be added to them, if more were requisite,) the jury received from the judge, all the instruction which, as yet, our courts have deemed to be requisite.

It is insisted, however, that "the necessity should be" defined "to the jury, and that" a standard be "furnished, by which the question of adequate necessity is to be tested;" and in order to supply this "standard," and to justify the exercise of what is called "the master's" "extreme authority," it is said, that the language to be used by the judge, must be like this:—"The necessity must be urgent and stringent"—"a necessity which leaves no alternative, and puts the party in a positive state of compulsion to act."

We do not mean to say, that such language, in such a case, is inadmissible; we merely deny that it is necessary to introduce those phrases into a judge's instruction. It may be added, that these phrases insisted upon, do not furnish to the minds

of the jury, any better "standard," than the language used by the court below, whereby to enable them to judge, whether "an adequate necessity" existed, for a sale.

In the case of the *Patapsco Insurance Company, against Southgate and others,* 5 *Peters,* 619, the Supreme Court of the *United States* affirmed the judgment of the court below, in which, among others, was this instruction given to the jury :— "If they should be of opinion that it was not such a case of urgent necessity as to justify the sale, then the plaintiffs are not entitled to recover for a total loss." In the same opinion, the court seemed to suppose, that the difficulty in such cases is imposed upon the jury, rather than the court. "The difficulty," said *Judge Thompson,* "in all these cases, consists, principally, in the application of a rule, to a given case, than in determining what the rule is."

This court, too, in the case of *Cohen against the Neptune Insurance Company,* discovered no error in the instruction, in effect, that if it was necessary, in the opinion of the jury, for the interests of all concerned, that said vessel should be sold, and that under such necessity, she was in good faith sold, then the plaintiff is entitled to recover on the policy, though no valid abandonment was made.

We conclude then, that the court below did not err in granting the instruction asked by the plaintiff there; that there was evidence, from which the jury might infer a necessity to sell; and that the instruction given to the jury, was quite sufficient to enable them to apply the rule of law to the circumstances of the case.

We thus dispose of the important questions raised in the court below. There was, it is true, some other exceptions; but in these we find nothing which will warrant a reversal of the judgment. In this case it was preferred, to submit at once a variety of prayers, and that the court should, in one charge, embody so much of them as the judge thought to be correct. It is no wonder, that among them are to be found prayers, which would demand our attention, if others had been disposed of, otherwise than they were. We discover nothing that was said, or omitted to be said by the judge, whereby the defend-

ant in the court below, was aggrieved; though something to be found in those prayers might have been proper, if there had been a valid abandonment; and upon this ground alone, the plaintiff in the court below, had claimed as for a total loss.

Some of the instructions which were asked for, and refused, might have been granted; but it is believed, that the instruction given covers the whole ground, and therefore, for the rejection of them, the judgment ought not to be reversed. For this there are precedents, one of which may be found in *Stokes against Saltonsal*, 13 *Peters*, 191.

JUDGMENT AFFIRMED.